**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CRIMINAL ACTION** |
| **vs.** | : | |
| | : | **NO. 09-169-01** |
| **RICHARD VALENTINE** | : | |

**DuBOIS, J.**                                                           **SEPTEMBER 1, 2009**

**M E M O R A N D U M**

## I.   INTRODUCTION

Defendant, Richard Valentine, is charged in a four-count Indictment with: Count 1 –

possession with intent to distribute five grams or more of cocaine base ("crack"), in violation of

21 U.S.C. §§ 841(a)(1), (b)(1)(B); Count 2 – possession of a firearm in furtherance of a drug

trafficking crime, in violation of 18 U.S.C. § 924(c)(1)(A); Count 3 – possession of oxycodone,

in violation of 21 U.S.C. § 844(a); Count 4 – possession of a firearm by a convicted felon, in

violation of 18 U.S.C. §§ 922(g)(1), 924(e)(1).

Presently before the Court is defendant's Motion to Suppress Physical Evidence and

Statements in which defendant moves to suppress "all evidence seized from his vehicle . . . [and]

any statements made" following a vehicle stop in Bensalem Township on November 12, 2008.

The Court held a hearing on July 31, 2009 and granted leave to file supplemental briefs in light

of the evidence presented at the hearing.[1] Upon consideration of the briefs and argument of

---

[1] To avoid confusion, the Court will cite to the briefs submitted before and after the July
31, 2009 hearing using the following abbreviated titles, although they do not necessarily
correspond to the given titles of those documents: Def. Mot. (Doc. No. 14); Gov't Resp. (Doc.
No. 18); Def. Supp. Mot. (Doc. No. 29); Gov't Supp. Resp. (Doc. No. 32); Def. 2d Supp. Mot.
(Doc. No. 33); and Gov't 2d Supp. Resp. (Doc. No. 36). The document numbers in this list
identify the relevant entries on the Court's docket, but will not be included in further citations.

counsel and the evidence presented at the hearing, for the reasons set forth below, defendant's Motion to Suppress is denied.

## II.     BACKGROUND

The following facts are taken from the undisputed testimony of Police Officer Joseph Ganksy and Police Corporal George Price, members of the Bensalem Police Department ("BPD"), at the hearing on July 31, 2009. Where applicable, the Court also cites to documents received in evidence at the hearing. Defendant did not testify or otherwise present evidence in support of his motion.

### A.     Car Stop, Impoundment, and Inventory Search

On the evening of November 12, 2008, Officer Gansky was assigned to patrol Sector 2 of Bensalem Township, an area to the east of Bensalem Township which abuts the west side of Bristol Township.  Sometime shortly before 9:49 p.m., Officer Ganksy followed a vehicle from Bensalem Township into Bristol Township. After turning around to return to Bensalem Township, Officer Ganksy observed an old model Honda Civic (PA Plate No. HCC 4927) ("Civic") driving west on New Falls Road in Bristol Township near its border with Bensalem Township. Officer Gansky noticed the car because it "passed in front of [him] . . . at a high rate of speed[2] [and] also had dark tinted windows." (Hr'g Tr. 44.) Officer Ganksy "checked the Civic's registration status" by running the plates and discovered that the Civic was registered to defendant Valentine at a Norristown address. (Id. at 44-45.) When Officer Ganksy pulled up behind the Civic, the driver made a quick left hand turn and drove away. Officer Ganksy thought

_____

[2] On cross-examination, defense counsel asked Officer Gansky if the Civic was speeding. Officer Ganksy responded "I don't—it came at—it passed me at a high rate of speed." (Hr'g Tr. 72-73.) In any case, any speeding violation was not a basis for the eventual car stop made by Officer Ganksy.

this behavior "appeared suspicious," but did not pursue the Civic because he was in Bristol Township and lacked jurisdiction; instead, he continued driving towards Bensalem Township. (Id. at 45, 108-09.) Officer Gansky testified that he had no previous contact with the Civic or defendant Valentine. (Id. at 77.)

Less than five minutes later, while parked facing Bridge Road in Bensalem Township near the border of Bensalem Township and Bristol Township, Officer Gansky observed the same Civic driving west on Bridge Road, having just crossed the border from Bristol Township into Bensalem Township. (Hr'g Tr. 45-46.) Officer Gansky pulled into traffic and maneuvered his vehicle behind the Civic. (Id. at 46.) At this point, the Civic signaled for a left hand turn and turned left onto Bensalem Boulevard; Officer Ganksy followed. (Id.) The Civic again signaled for a left hand turn, at which point, Officer Ganksy initiated a car stop by turning on the overhead lights of his police vehicle. (Id. at 46, 51.) Officer Ganksy testified that the reason for the stop was "the vehicle code violation of the tint on the window[3] and the suspicious activity." (Id. at 68-69.)   According to Officer Gansky, the Civic complied "in all other respects . . . with turn signals and stopping at red lights" and the Civic was not speeding or weaving when it was stopped. (Id. at 75, 76.)

After Officer Ganksy activated his lights, the Civic turned left into a shopping center and parked in a designated parking space. (Hr'g Tr. 51, 77.) The space was located "off to the side of the shopping center stores" and was not obstructing traffic. (Id. at 77.) Officer Gansky

---

[3] The Pennsylvania Code, 75 Pa. C.S.A. § 4524(e)(1), provides that "[n]o person shall drive any motor vehicle with any sun screening device or other material which does not permit a person to see or view the inside of the vehicle through the windshield, side wing or side window of the vehicle."

approached the passenger side of the Civic and asked the driver, defendant Valentine, for his driver's licence, registration, and insurance. (Id. at 52.) Valentine responded that he was driving on a suspended licence and had neither insurance nor registration. (Id. at 53.) Officer Gansky then asked Valentine if there was any documentation in the glove compartment, and Valentine responded that there was not. (Id. at 78.) During this initial exchange, Valentine gave Officer Ganksy an identification card.[4] (Id. at 54.)

Officer Gansky returned to his vehicle to run a background and warrant check on Valentine. (Hr'g Tr. 55.) He confirmed that Valentine's license was suspended. (Id.) A search for open warrants in Bucks County produced no results. However, when Gansky entered Valentine's information in the Bensalem Police Department's in-house offender registry, referred to as the CODY system, he learned that Valentine was a known offender with contacts involving weapons violations, domestic violence, and harassment. (Id. at 55-56.) He then called for more information and was told by Officer Michael Brady that Valentine had an extensive criminal history, including arrests for violent felonies and gun possession. (Id. at 56.) Officer Brady also reported that Valentine had been known to flee. (Id. at 79-80.) After hearing that report, Officer Gansky called for backup. (Id. at 57.) Officer Ganksy admitted that he did not shine his flashlight on the windows of the Civic, request a tint-meter, or otherwise investigate the alleged violation of the Pennsylvania window tint statute. (Id. at 76.)

---

[4] Officer Gansky also asked Valentine where he was coming from and where he was going. According to Officer Ganksy, Valentine stated that he was coming from a bar in Bristol and was planning on meeting "his girl" at a "mart" in the shopping center where he was pulled over. (Hr'g Tr. 53.) At the hearing, Gansky noted that none of the stores in the shopping center were open when Valentine was pulled over. (Id. at 54.)

4

When backup officers arrived, Gansky briefed them on the situation.[5] (Hr'g Tr. 57.) He informed the other officers that Valentine was a known offender with arrests for gun possession, that he had no license, no registration, and no insurance. Officer Gansky also told the other officers that the defendant "wouldn't open the glove box." (Id. at 57, 83-85; Gov't 2d Supp. Resp., Exh B at 1, 4.) Officer Michael Sheehy responded to this information by stating, "[t]ow him."[6] (Hr'g Tr. 85, 108; Gov't 2d Supp. Resp., Exh B at 1.) When asked during the hearing why he sought the tow, Officer Ganksy stated that "[t]he vehicle was towed due to the suspended license, no insurance and no registration paperwork." (Hr'g Tr. 69, 98.) However, Officer Gansky also admitted on cross examination that he "indicated to other officers that [Valentine] wouldn't let [him] search the vehicle but [he] wanted to get into the vehicle." (Id. at 80-81.)

In accordance with BPD procedure, Officer Gansky called his supervising officer, Corporal George Price, for authorization to impound the Civic. (Hr'g Tr. 57.) Officer Ganksy's portion of the conversation was audio recorded and played during the hearing. He stated the following: "I'm on a car stop. [T]hey're telling me [the driver is] a violent guy with a lot of stolen guns . . . [H]e's got a suspended license and no insurance. [H]e won't open the glove box, so [I'm] trying to get permission to tow on that." (Gov't 2d Supp. Resp., Exh B at 2.) Corporal

---

[5] At least five officers responded to Officer Gansky's call (Hr'g Tr. 93) including Officer Brady, Officer Michael Sheehy and Officer Adam Kolman. (Gov't 2d Supp. Resp., Exh. B.)

[6] The conversation between Officer Gansky and Officer Sheehy was recorded and played during the hearing, along with several other recorded conversations. The Court requested agreed-upon transcripts of any and all recordings played during the hearing. The agreed-upon transcript is attached to the Government's Second Supplemental Response as Exhibit B. Some portions of the tape recorded conversation between Officer Gansky and Officer Sheehy were not intelligible and therefore not transcribed. (Gov't 2d Supp. Resp., Exh B at 1.) After the tape was played for Officer Gansky during the hearing, Officer Gansky testified that Officer Sheehy said, "You can call for a tow[;] that way you can get into the car." (Hr'g Tr. 108.)

Price authorized the impoundment of the Civic, after which Gansky stated, "[W]e'll tow the car and see what's going on." (Id.; Hr'g Tr. 86.) Officer Ganksy confirmed that when he said "we'll . . . see what's going on," he meant "[we'll] see what we're going to find inside the car" and that he was looking for "guns or drugs or something that matches [Valentine's] previous history." (Hr'g Tr. 86-87.) Corporal Price testified that his decision to authorize the impoundment of the Civic was based solely on the fact that Valentine was driving on a suspended licence and without insurance; he did not consider the other information provided by Officer Gansky as part of his impound decision. (Id. at 15, 26.)

During the above-described exchanges, Valentine remained in his vehicle. (Hr'g Tr. 58.) After receiving authorization to tow the car, Officer Gansky returned to the Civic and requested that Valentine exit the vehicle; Valentine complied. (Id.) Officer Ganksy patted Valentine down for officer safety and, at Valentine's request, retrieved a cell phone and an undetermined amount of money, both of which he gave to Valentine. (Id. at 58.) Officer Gansky then proceeded to inspect the vehicle for damage and inventory its contents, liability measures required by the BPD impoundment procedure. (Id. at 59-60, 89-90.) Officer Gansky searched first the interior of the Civic, then the glove compartment, and then the trunk.

In the interior of the car, Officer Ganksy found loose change and assorted compact discs ("CDs"). (Hr'g Tr. 90.) In the glove compartment, which was unlocked according to Officer Gansky's recollection, Officer Gansky found two prescription pill bottles containing pills.[7] (Id. at 59-60.) There were no labels on the bottles. (Id.) Officer Gansky then opened the trunk using the

---

[7] Subsequent chemical testing identified the pills as a mixture containing a detectable amount of oxycodone. Officer Ganksy testified that Valentine identified the pills as Percocet. (Hr'g Tr. 60.)

trunk door release latch in the car. (Id. at 60.) At this point, Valentine "jumped and ran towards" the back of the Civic and "slammed" the trunk. (Id.) Officer Ganksy placed Valentine in handcuffs for officer safety and informed Valentine that the BPD's inventory procedure required a full search of the vehicle, including the trunk. (Id. at 61.) According to Officer Gansky, Valentine responded by saying, "You can have the car, you can arrest me, but you cannot search the trunk." (Id.)

Officer Gansky then re-opened the trunk of the Civic and continued his inventory search. (Hr'g Tr. 61.) The trunk contained: (1) various items of clothing, including shoes, (2) two clear bags of a white powdery substance which fell out of the pocket of a pair of jeans,[8] (3) a black digital scale with white powdery residue on it, (4) a Jennings Model 25 automatic pistol, loaded with four live rounds of .25 caliber ammunition, and (5) a second magazine loaded with four live rounds of .25 caliber ammunition. (Id. at 62.) After finding the gun, ammunition, and bags containing the white powdery substance, Officer Gansky placed Valentine under arrest. (Id. at 62.) Valentine was not issued a citation for any vehicle code violations. (Id. at 99-100.)

At some point after the car stop and search, Officer Ganksy completed a BPD form entitled "Vehicle Impound and Inventory Record." (Hr'g Tr. 63; Gov't Hr'g Exh. C.) Under "Reason Impounded," Officer Ganksy mistakenly entered "Knights Collossion," the towing company used to tow the Civic. (Hr'g Tr. 97; Gov't Hr'g Exh. C.) In the space provided for "Personal Property in Vehicle," Officer Ganksy listed "clothes, shoes, socks, license plate, silver hand gun, pants, cell phone." (Gov't Hr'g Exh. C.) A number of items found in the vehicle were

---

[8] Subsequent chemical testing identified the white powdery substance as a mixture containing a detectable amount of cocaine base ("crack").

not mentioned in the Inventory Record. (Id.; Hr'g Tr. 90-91)

**B.      BPD Impound & Inventory Procedure**

The BPD's impound and inventory procedure is described in BPD Field Training Officer

Manual ("FTO Manual") as follows:

> When impounding a motor vehicle whether it be for a vehicle code violation or an
> arrest, an inventory of the vehicle must be completed and an inventory sheet must
> be filled out. On this inventory sheet be sure to list any damages to the vehicle. If
> you feel that a vehicle needs to be towed due to vehicle code violation you need to
> first get your sergeant's approval. Vehicle code infractions that may constitute
> impounding are: no insurance, no licensed drivers in the vehicle, or unregistered
> vehicle.

(Gov't Hr'g Exh. B; Hr'g Tr. 7-9.) Corporal Price testified that the above quoted material

constitutes the "only document that exists within the Bensalem Police Department regarding

impounding and inventorying." (Hr'g Tr. 18.) The specifics of the BPD impound and inventory

procedure were provided by Corporal Price's hearing testimony, as follows.

Corporal Price stated that the "[c]riteria as far as traffic violations [which would justify

impoundment] would be either a suspended driver's license without a licensed driver also in the

car, no registration or no insurance." (Hr'g Tr. 6, 9.) He later added that a citation for driving

under the influence might also justify impoundment. (Id. at 35.)

A superior officer must authorize every impoundment. (Hr'g Tr. 6, 9, 35.) When a field

officer thinks impoundment is warranted, he must contact his superior officer and describe the

circumstances which, in his judgment, justify the decision to impound. (Id. at 6, 9-10.) If the

superior officer agrees that the circumstances warrant impounding the vehicle, he authorizes the

impound. (Id. at 10, 34, 36-37.) Field officers do not have any control over the impound decision

itself, but they do have discretion in deciding whether to allow a driver to leave with a citation or

to call their superior for authority to impound when they find a driver has no valid insurance or registration, or no driver's license, and no licensed driver is available. (Id. at 19-21, 98-110.) When asked whether officers had discretion not to tow when they determined that the driver had no license and no insurance, as in this case, Corporal Price said "Could it happen? Yes, but I don't think it's the common practice."  (Id at 36.)

On cross-examination, Officer Gansky testified that he cited motor vehicle drivers in the past for not having valid insurance or valid registration and allowed those drivers to proceed without impounding their vehicles. (Hr'g Tr. 98-99.) He further testified that he cited motor vehicle drivers in the past for driving on a suspended license and allowed those drivers to proceed even though there was no other licensed driver in the car without impounding their vehicles. (Id. at 99.) On re-direct, counsel for the government asked Officer Gansky about his impound practice with regard to drivers stopped with no valid insurance *and* no valid driver's license, where there was no other licensed driver in the car. Officer Gansky testified that he would impound a vehicle under those circumstances. (Id. at 110.) However, when asked if he would ever allow someone with all three violations to drive away, Officer Ganksy stated, "I don't know 100 percent of the time, I don't know." (Id. at 110.)

As reported by Corporal Price, the purpose of the inventory search is to assess the condition of the vehicle and contents, note any pre-existing damage, and record any valuable items.  (Hr'g Tr. 11.) The search is comprehensive, covering all areas of the vehicle with the exception of any locked compartments or boxes which can only be opened by force. (Id. at 11.) With regard to the inventory form, Corporal Price testified that it should include all items of "significant value," either monetary value or evidentiary value. (Id. at 12, 22-23.) It would not

9

include "bolted in," *i.e.*, installed, items such as speakers. (Id. at 24.) Items can be grouped, *e.g.*,

"assorted clothing." (Id. at 12, 24-25.) If items of evidentiary value are located in the vehicle they

are logged in the inventory form and confiscated. (Id. at 13.) Corporal Price testified that an

inventory search is improperly completed if items of significant value are omitted or if other

entries are left blank. (Id. at 12, 22.)

Field officers learn the impound and inventory practice through the FTO Manual and

through a three-month Field Training Program, an apprenticeship period during which a new

officer is paired with an experienced officer.  (Hr'g Tr. 32.) On cross-examination, Corporal

Price confirmed that the written impound and inventory policy does not give any instructions on

proper inventory search procedure and that Officer Gansky "could have [conducted the inventory

search] any way he felt appropriate at the time." (Id. at 17-19.)

## C.     Statements Made By Valentine

At the hearing, the counsel for defendant and for the government stipulated to the

substance of Officer Schwartz's testimony with regard to statements given by Valentine after

arrest. According to that stipulation,

> "[Officer Schwartz] would testify that he took a statement, after giving Defendant
> Richard Valentine his *Miranda* warnings, and they were waived; that the
> statement occurred inside of Bensalem Police Department Headquarters in a room
> where there were only two officers present, Officer Schwartz and another witness;
> that Officer Schwartz was the sole person who asked the questions during the time
> that the statement was being provided by Mr. Valentine; that Mr. Valentine was
> not handcuffed at that time."

(Hr'g Tr. 112.) Counsel for both parties also stipulated to the authenticity of a signed statement

provided by defendant in which he waived his *Miranda* rights and answered Officer Schwartz's

questions. (Id. at 113; Gov't Hr'g Exh. D.) In the statement, defendant admitted to possessing the

10

drugs and gun found in the trunk of the Civic and further admitted that he was stopped by Officer Gansky while en route to a drug sale. (Gov't Hr'g Exh. D at 4.)

## III.   DISCUSSION

In the instant Motion to Suppress, defendant contests the basis for the traffic stop, the decision to impound, and the sufficiency of the BPD inventory search procedure. Defense counsel has made no legal arguments concerning the voluntariness of defendant's statements or the validity of defendant's *Miranda* waiver.

"On a motion to suppress, the government bears the burden of showing that each individual act constituting a search or seizure under the Fourth Amendment was reasonable." United States v. Ritter, 416 F.3d 256, 261 (3d Cir. 2005) (citing United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995)).  The applicable burden is proof by a preponderance of the evidence.  United States v. Matlock, 415 U.S. 164, 178 n.14 (1974).

## A.   Traffic Stop for Motor Vehicle Code Violations

Stopping and detaining a vehicle and its occupants is a seizure under Fourth Amendment to the United States Constitution.  Johnson, 63 F.3d at 245.  To be reasonable under the Fourth Amendment, a vehicle stop must be based on reasonable suspicion, not probable cause.  United States v. Delfin-Colina, 464 F.3d 392, 397 (3d Cir. 2006).  Under Third Circuit precedent, "a traffic stop will be deemed a reasonable 'seizure' when an objective review of the facts shows that an officer possessed specific, articulable facts that an individual was violating a [correctly interpreted] traffic law at the time of the stop."  Id. at 398.  Moreover, "an officer need not be factually accurate in her belief that a traffic law had been violated but, instead, need only produce facts establishing that she reasonably believed that a violation had taken place."  Id.  This

11

standard has been described as "not particularly rigorous, as no traffic law need actually have been broken, nor does the stopping officer have to be correct regarding the facts."  United States v. Fleetwood, 235 F. App'x 892, 895 (3d Cir. 2007) (non-precedential).

To "evaluat[e] the constitutionality of a traffic stop, a court is free to examine the sufficiency of the reasons for the stop as well as the officer's credibility."  Johnson, 63 F.3d at 247.  Under the "authorization test" adopted by the Third Circuit, "the validity of a traffic stop should be evaluated on the officer's objective legal basis for the stop . . . ."  Id.  The officer's subjective basis or pretextual reason for the stop is irrelevant provided that the officer possessed reasonable suspicion that the defendant violated a traffic law.  Id. at 247–48.

In the course of a traffic stop, police officers may request a driver's license, registration, and other paperwork, may run records checks, may issue citations or warnings, and may inquire as to the occupants' destination and purpose. United States v. Givan, 320 F.3d 452, 459 (3d Cir. 2003); United States v. Rosborough, 366 F.3d 1145, 1148 (10th Cir. 2004).  However, a traffic stop must be reasonably related in scope to the justification for the stop. Johnson, 63 F.3d at 247. Any intrusions beyond the scope of the original stop must be justified by independent reasonable suspicion or probable cause. Id.

In this case, the government argues that Officer Gansky's traffic stop did not violate defendant's Fourth Amendment rights because Officer Ganksy had reasonable suspicion that the Civic's windows were tinted in violation of 75 Pa. C.S.A. § 4524(e)(1). That statute prohibits the operation of "any motor vehicle with any sun screening device or other material which does not permit a person to see or view the inside of the vehicle through the windshield, side wing or side window of the vehicle." Under the Pennsylvania Administrative Code, the required level of light

12

transmittance for passenger vehicles is set at seventy percent (70%). 67 Pa. Code § 175.67(d)(4), 175.263, 175 tbl. X.

The "specific, articulable facts" provided by Officer Gansky with regard to the alleged window tint violation were: (1) he first noticed the Civic because "it had . . . dark tinted windows" and passed at a high rate of speed (Hr'g Tr. 44); (2) when he stopped the Civic he was not able to see how many occupants were in the vehicle "[d]ue to the tint on the back windows and side windows" (Id. at 52); and (3) when asked about his reason for the stop, Officer Gansky stated "due to the night time and the tint on the windows I could not see into the vehicle" (Id. at 69). Officer Ganksy did not describe the light conditions on the night in question.

Defendant argues that these facts are insufficient to establish that Officer Ganksy's suspicion with regard to the Civic's window tint violation was reasonable. In addition, defendant argues that other evidence shows that Officer Ganksy was not, at least primarily, concerned with any alleged window tint violation. Specifically, Officer Ganksy did not immediately stop the Civic for the window tint violation when it entered Bensalem Township; he did not shine a flashlight on the Civic's windows when he first approached the vehicle; he did not request a tint meter or otherwise verify the suspected violation; and he did not issue any citation for the window tint violation. (Hr'g Tr. 75-76, 99-100.) According to the defendant, this evidence shows that the alleged window tint violation was a pretextual reason for the stop and, in addition, supports a conclusion that Officer Gansky did not have reasonable suspicion of the window tint violation. (Def. 2d Supp. Mot. 9-11.)

The question before the Court is not whether the Civic's windows violated the window tint statute, 75 Pa. C.S.A. § 4524(e)(1)—indeed, the government presented no evidence on that

issue. Instead, the question is whether "an objective review of the facts shows that [Officer Ganksy] possessed specific, articulable facts that [defendant] was violating [the Pennsylvania window tint statute] at the time of the stop."  Delfin-Colina, 464 F.3d at 398.

Defendant cites two cases in support of his position. In the first case, the court ruled that the officer did not have reasonable suspicion that the defendant's car violated the window tint statute. Pennsylvania v. Hatzas, No. 06-2800, 2007 Pa. Dist. & Cnty. Dec. Lexis 93 (Pa. Ct. Com. Pl. Mar. 2, 2007), aff'd 945 A.2d 762 (Pa. Super. Ct. 2007). The Hatzas court concluded that "[b]ased upon the fact that the Sergeant's observations were made at night, 11:16 p.m. [on March 31, 2006], while the vehicle was traveling past the Sergeant's stationary location with minimal lighting[,] this Court does not believe the Sergeant possessed the requisite reasonable suspicion necessary to initiate a traffic stop of the Appellee's vehicle." Id. at *6. The Hatzas court's decision was also based on a determination that the officer's testimony was "less than credible." Id. at *2, 6.

In the second case cited by defendant, the court denied the motion to suppress, but the decision was based on a record that was more developed than the one presently before this Court. United States v. Ushery, 526 F. Supp. 2d 497, 499, 501-02 (M.D. Pa. 2007). In that case, the officer observed the car in question during the "pre-dawn" hours of June 24, 2007. Id. at 499.  He had his high beam headlights trained on the street in front of him and when the defendant's car passed in front of him it was "immediately apparent" that the defendant's windows were tinted darker than permitted by the Pennsylvania vehicle regulations. Id.  The officer had seven years of experience and had stopped vehicles for window tint violations on "hundreds of occasions." Id. at 499 nn.2 & 3. In addition, a second officer testified that when he arrived on the scene, he could

14

tell "just by looking at [the window tint,] [that] it was very dark." Id. at 502. The officers used a tint meter to measure the light transmitted by the defendant's windows and determined that only sixteen percent of light penetrated through, "well below the seventy percent required by Pennsylvania regulations." Id. Based on these facts, the court concluded that the officer's belief that the defendant's tint grade violated Pennsylvania law was "eminently reasonable" and upheld the car stop on that ground. Id.

The government has not cited any cases on this issue. However, the Court, through its own research, has found several cases which held that an officer's testimony concerning his inability to see through a defendant's vehicle windows was sufficient to establish the officer's reasonable suspicion that the windows were overly tinted in violation of Pennsylvania law. See United States v. Bellinger, 284 F. App'x 966, 968 (3d Cir. 2008); United States v. Leal, 235 F. App'x 937, 938-39 (3d Cir. 2007); United States v. Truley, No. 08-105, 2009 WL 2029975, *2 (W.D. Pa. July 13, 2009); United States v. Lynch, 290 F. Supp. 2d 490, 495 (M.D. Pa. 2003); see also Holeman v. City of New London, 425 F.3d 184, 191 n.2 (2d Cir. 2005); United States v. Wallace, 213 F.3d 1216, 1220 (9th Cir. 2000). The Court finds these cases instructive and concludes, notwithstanding the fact that the record is not as developed as in Ushery, that Officer Gansky's testimony concerning his inability to see through the windows of defendant's Civic is sufficient to establish reasonable suspicion in this case.

The Court finds that Officer Gansky testified credibly concerning his observations of the Civic on the evening of November 12, 2008.  He said he first noticed the car because of its darkly tinted windows, and stated that the tinted windows were what "drew [his] attention to the vehicle." (Hr'g Tr. 44.) He also testified that the windows were so darkly tinted he could not see through them. (Id. at 52.)

Based on this testimony, the Court concludes that Officer Ganksy's observations provide a basis for his reasonable suspicion that the tinting on Civic's windows did "not permit a person to see or view the inside of the vehicle" in violation of 75 Pa. C.S.A. § 4524(e)(1). See Bellinger, 284 F. App'x at 968; Leal, 235 F. App'x at 938-39.

That Officer Ganksy might have also had other reasons for stopping the Civic does not invalidate the stop. Johnson, 63 F.3d at 247-48. Further, the Court does not deem significant to the fact that Officer Gansky did not follow-up on the alleged window tint violation in view of the fact that, after the stop, he discovered other vehicle code violations—driving on a suspended license and absence of valid insurance or registration—which he did investigate.

For all the foregoing reasons, the Court concludes that the car stop was lawful. Defendant's Fourth Amendment rights were not violated by the stop.

**B.      Impoundment Decision & Inventory Search**

The government contends that the impoundment and search of defendant's Civic was reasonable because the officer's actions complied with standard BPD procedures. (Gov't 2d Supp. Resp. 4-5.) Defendant argues that while the BPD impound procedure did authorize the impoundment of the Civic in this case, the seizure was nevertheless invalid under the Fourth Amendment because the decision to impound and inventory was actually based on an improper investigatory motive and because the government did not present evidence of "any standardized written criteria or routine governing the scope of inventory searches."[9] (Def. 2d Supp. Mot. 17-18.)

_____

[9] Defendant also argues that the impoundment and inventory search of defendant's Civic was invalid because the BPD did not follow the procedure mandated by 75 Pa. C.S.A. § 6309.2 and the Pennsylvania Superior Court's decision in Commonwealth v. Thurman, 872 A.2d 838 (Pa. Super. Ct. 2005). This argument is without merit. As the government correctly points out, "evidence obtained in accordance with federal law is admissible in federal court—even though it

16

Police officers wield broad authority to impound vehicles pursuant to the "police community caretaking function." South Dakota v. Opperman, 428 U.S. 364, 369 (1976). "The authority of police to seize and remove from the streets vehicles impeding traffic or threatening public safety and convenience is beyond challenge." Id. The decision to impound must be reasonable but need not be made pursuant to a standardized police procedure. United States v. Smith, 522 F.3d 305, 312, 314-15 (3d Cir. 2008) (enunciating for the first time in the Third Circuit the Fourth Amendment requirements with regard to officers' decisions to impound a vehicle). Nevertheless, impoundment decisions that are made pursuant to a standardized police procedures "will most likely, although not necessarily always, satisfy the Fourth Amendment." Id. at 312 (referencing Colorado v. Bertine, 479 U.S. 367 (1987)).

Where property has been lawfully impounded, warrantless "inventories pursuant to standard police procedures are reasonable" and do not violate the Fourth Amendment. South Dakota v. Opperman, 428 U.S. 364, 369-71 (1976). To be valid, an inventory search must be "conducted according to standardized criteria or established routine." Bertine, 479 U.S. at 374 n.6; United States v. Frank, 864 F.2d 992, 1002 (3d Cir. 1988). Although the standardized criteria or established routine must limit a police officer's discretion with regard to the decision to search and the scope of the search, it need not be based on formalized written standards. United States v. Salmon, 944 F.2d 1106, 1121 (3d Cir. 1991); Frank, 864 F.2d at 1002.

The defendant correctly points out that motive is a relevant consideration in the context of impound decisions and inventory searches. In Bertine, the Supreme Court stated that police discretion

---

was obtained by state officers in violation of state law." United States v. Rickus, 737 F.2d 360, 363-64 (3d Cir. 1984). In the context of impound decisions and inventory searches, the Fourth Amendment requires that the decision to impound be reasonable and that the inventory search be made pursuant to "standardized criteria or established routine." Bertine, 479 U.S. at 374 n.6; Smith, 522 F.3d 305 at 314-15. As long as the procedures followed by the officers conducting the impound and inventory in question satisfy the relevant Fourth Amendment standards, the fact that they do not satisfy particular state law requirements is irrelevant.

with regard to the decision to impound a vehicle must be "exercised . . . on the basis of *something other than suspicion of evidence of criminal activity*." 479 U.S. at 375. In <u>Opperman</u>, the Court noted that it "has consistently sustained police intrusions into automobiles impounded or otherwise in lawful police custody where the process *is aimed at securing or protecting the car and its contents*." 428 U.S. at 373. One court has observed that motive is important because it is "the sole factor which distinguishes the criminal investigatory search from the noncriminal inventory search of an automobile." <u>United States v. Abbott</u>, 584 F. Supp. 442 (W.D. Pa. 1984).

However, an investigatory motive does not necessarily invalidate an otherwise valid impoundment and inventory search. "As long as impoundment pursuant to the community caretaking function is not a mere subterfuge for investigation, the coexistence of investigatory and caretaking motives will not invalidate the seizure." <u>United States v. Rodriguez-Morales</u>, 929 F.2d 780, 787 (1st Cir. 1991). Further, "[t]he mere fact that an inventory search may also have had an investigatory purpose does not . . . invalidate it." <u>Frank</u>, 864 F.2d at 1001.

The focus of the Court's inquiry on this issue is on the BPD's decision to impound defendant's Civic.[10] The government, relying on <u>Opperman</u> and <u>Bertine</u>, points out that the impound decision in this case was made in compliance with the BPD's standard procedure which authorizes the impoundment of vehicles where the vehicle code violations are "no insurance, no licensed drivers in the vehicle, or unregistered vehicle." (Gov't Hr'g Exh. B.) According to the government, the existence of and compliance with the BPD's policy provides strong support for the reasonableness of the seizure

---

[10] Defendant also argues that the BPD policy did not limit the "scope" of the inventory search such that it would not satisfy the <u>Salmon</u> / <u>Frank</u> standard with regard to inventory searches. This argument lacks merit because Corporal Price testified that field officers are instructed to search all accessible portions of the vehicle and are not allowed to search any locked areas or containers within a vehicle, rules that Officer Gansky abided by. (Hr'g Tr. 11, 59-62.) Defendant has not identified any other limitations on the scope of inventory searches that are required under the Fourth Amendment.

in this case. Defendant counters that this policy is "flawed" because it leaves individual officers with "unfettered discretion on when to request an impound." (Def. 2d Supp. Mot. 14.) For the reasons that follow, the Court agrees with the government.

The Third Circuit has recently held that impound decisions need not be made pursuant to standardized police procedures as long as the decision is reasonable. Smith, 522 F.3d at 312, 314-15. Nevertheless, the existence of a standardized policy remains relevant because impoundment decisions that are made pursuant to standardized police procedures "will most likely, although not necessarily always, satisfy the Fourth Amendment." Id. at 312.

The written BPD policy allows impoundment if a vehicle is stopped with "no insurance, no licensed drivers in the vehicle, or unregistered vehicle." (Gov't Hr'g Exh. B.) Other infractions, such as driving under the influence of alcohol, might also warrant impoundment, but are not mentioned in the written policy. (Hr'g Tr. 35; Hr'g Exh. B.) The policy also provides that officers "need to first get [their] sergeant's approval . . . if [they] feel that a vehicle needs to be towed due to a vehicle code violation." (Id.) These provisions limit field officer's discretion in deciding whether or not to impound a vehicle and protect individuals from arbitrary police action.

Defendant argues that the policy should not be credited because it leaves field officers with too much discretion. The Court disagrees. Although both witnesses testified that officers infrequently exercise discretion not to impound based on the enumerated infractions, Corporal Price testified that he would "say tow" if it was reported that a driver had no driver's license, no insurance, and there was no licensed driver available. (Id. at 34.)  He also stated that he did not think it was "common practice" to allow drivers with those enumerated violations to drive away. (Id. at 36.) Any such infrequent exercise of discretion does not undermine the validity of the BPD policy under the Fourth Amendment.

The only specific evidence on the issue of discretion when a vehicle is stopped and, as in this case, the driver has no valid insurance and no valid driver's license, and there is no licensed driver available, is Officer Ganksy's testimony. He first testified that he would impound a vehicle under those circumstances. Then, when asked whether he would ever allow someone with both of those violations to drive away, he stated, "I don't know 100 percent of the time, I don't know." (Hr'g Tr. 110.) The fact that, under that testimony, the impound policy might not be followed "100 percent of the time" when an officer finds a driver has no insurance and no valid driver's license, and there is no licensed driver available, does not invalidate the impoundment and inventory search.

The parties dispute whether the evidence shows that Officer Gansky's decision to impound defendant's Civic was based on an improper investigatory motive. Defendant argues that "[i]f defendant did not have a criminal history in Pennsylvania or a long history with the [BPD], [Officer Gansky] would have permitted the defendant to drive away with a ticket." (Def. 2d Supp. Mot. 19.) Defendant bases this conclusion on the following evidence: Officer Gansky's inconsistent history of impounding vehicles with no insurance, no registration, and no licensed driver; Officer Gansky's statement to Corporal Price that he was "trying to get permission to tow" based, in part, on defendant's criminal history and refusal to open the glove compartment as well as his subsequent statement that "we'll tow the car and see what's going on"; the irregularities in Officer Gansky's inventory search process; and Officer Gansky's statements during the hearing to the effect that he was suspicious of the defendant based on his criminal history and was looking for drugs and/or guns during the inventory search.

The government responds by stating that defendant's violations—suspended license and lack of valid insurance or registration—provided ample grounds for Officer Gansky's decision to impound the Civic and that the Court should credit Officer Gansky's statement that "the vehicle was towed due to

the suspended license, no insurance, and no registration paperwork." (Hr'g Tr. 69.) The government further points to Gansky's statement that he would tow other cars if faced with the same violations. (Hr'g Tr. 110.)

The Court finds that Officer Gansky did have an investigatory motive, but that it was not the basis for his impoundment of defendant's Civic. The impoundment was accomplished in accordance with the BPD impound and inventory policy, and Corporal Price testified that his approval of Officer Ganksy's impound request was based solely on the fact that Valentine was stopped while driving on a suspended license and without insurance. The Court finds Corporal Price's testimony on this issue credible.  Based on this evidence, the Court concludes that Officer Ganksy's decision to impound and Corporal Price's decision to authorize the impound were reasonable under <u>Smith</u>, 522 F.3d at 314-15, and that, under <u>Frank</u>, 864 F.2d at 1001, Officer Gansky's investigative motive does not invalidate the impoundment and inventory search.

## IV.    CONCLUSION

For all of the foregoing reasons, defendant's Motion to Suppress Physical Evidence and Statements is denied.